IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JESMAR ENERGY, INC., )
           ) Civil Action No. 17-928
    Plaintiff, )
           ) Magistrate Judge Lisa Lenihan
    vs. )
           )
RANGE RESOURCES – APPALACHIA, ) ECF No. 4
LLC., )
           )
    Defendant. )

**OPINION**

LENIHAN, Magistrate Judge

    Pending before the Court is the Motion to Dismiss the Complaint or Stay Pending Arbitration filed by Defendant Range Resources – Appalachia, LLC ("Range"). (ECF No. 4). In the motion, Range seeks an order pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12 (b)(6) dismissing the Complaint filed against it by Plaintiff Jesmar Energy, Inc. ("Jesmar"), or, alternatively, compelling Jesmar to file its claims in arbitration. For the reasons set forth below, the Court will deny Range's motion.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    As previously summarized,[1] this action concerns a dispute over royalty amounts Jesmar contends Range owes Jesmar pursuant to an assignment of an oil and gas lease.

    On April 11, 2007, Jesmar signed an oil and gas lease ("Lease") with James E. Main

---

[1] See ECF No. 19, at 1-5.

1

("Mr. Main") wherein Mr. Main agreed to lease to Jesmar the right to drill for, produce, and develop approximately 153 net mineral acres of oil and gas in Buffalo Township, Washington County, Pennsylvania (the "Property"). (Compl., ¶ 3, ECF No. 1-2.) The term of the Lease was for ten years beginning on April 11, 2007, and for as long thereafter that date as gas may be produced from the Property. (ECF No. 1-2, ¶ 4.) The lease also provided for the payment of a one-eighth (1/8) royalty realized by the lessee of the Lease from the proceeds of the gas from the Property to be paid to Mr. Main. (ECF No. 1-2, ¶ 6.) The Lease contained an arbitration provision stating:

> ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this lease, performance thereunder, or damage caused by Lessee's operations, settlement shall be determined by a panel of three disinterested arbitrators. Lessor and Lessee shall appoint and pay the fee of one each, and the two so appointed shall appoint the third, whose fee shall be borne equally by Lessor and Lessee. The award shall be by unanimous decision of the arbitrators and shall be final.

(ECF No. 1-2, Ex. A.)

Thereafter, on or about August 30, 2011, Rice Drilling B, LLC ("Rice Energy") and Jesmar entered into a letter of intent for Rice Energy to purchase the Lease from Jesmar, with Jesmar reserving an overriding royalty interest ("ORRI") equal to the difference between 17.5% and the leasehold burden of record. (Id., ¶ 7.) On December 21, 2011, Jesmar and Rice Energy executed an Assignment of Oil and Gas Lease (the "Assignment"). (Id., ¶ 8.) The Assignment assigned all of Jesmar's right, title, and interest under the Lease to Rice Energy subject to Jesmar retaining an ORRI to the Lease:

> OVERRIDE: [Jesmar] hereby reserves an overriding royalty interest in the Subject Lease equal to the difference between the respective lease burdens of record and 17.5% in and to all of the oil, gas and the respective

constituents thereof, produced, saved, and marketed from the lands described therein, but in no event shall [Jesmar] deliver to [Rice Energy] less than an 82.5% net revenue interest in the [Lease]. In the event that the Subject Lease covers less than a full interest in the oil and gas in the lands described therein or [Jesmar] owns less than a full interest in the Subject Lease the overriding royalty interest herein reserved shall be proportionally reduced.

(Id., ¶ 10.) The lease burden of record (the Lease) referred to in the Assignment is a net lease allowing the lessee under the Lease to take deductions from the lessor's 1/8th royalty interest resulting in the royalty interest from the lease burden of record under the Lease being actually less than the 1/8th royalty interest defined in the Lease. (Id. at ¶ 12.) The Assignment does not provide for any post-production costs, deductions and/or adjustments (including but not limited to deductions for the cost of producing, gathering separating, treating, dehydrating, compression, transporting, and otherwise making the oil, gas and other products ready for sale or use) to be deducted from the ORRI. (Id. at ¶ 13.)

The Assignment concludes with the following language:

> TO HAVE AND TO HOLD the same unto the ASSIGNEE, its successors and assigns, according to the terms, covenants, and conditions of the Subject Lease, the ASSIGNEE to perform all such terms, covenants, and conditions thereof as to the Subject Lands, as well as all of the terms, covenants, and conditions hereof.
> The reservations, terms, conditions, and conditions hereof shall be binding upon and shall inure to the benefit of ASSIGNORS and ASSIGNEE, their respective successors and assigns, and shall attach to and run with the Subject Lease and the Subject Lands and with each transfer or assignment thereof.

(ECF No. 1-2, Ex. B.)

At some point between August 31, 2011 and April 14, 2016, Rice Energy conveyed the Assignment to Range. (Id. at ¶ 14.) In 2016, Range began drilling for, producing, and marketing natural gas from the Property, thereby requiring Range to pay Jesmar based upon

the ORRI it retained in the Assignment. (Id. at ¶ 17.) To date, all of the ORRI payments Range has made to Jesmar based upon the ORRI it retained in the Assignment, have been reduced by deductions for various costs Range alleges it has incurred for, among other things, transporting, gathering, purchasing fuel and processing natural gas from the Property. (Id. at ¶ 20.)

On June 12, 2017, Jesmar instituted this action in the Court of Common Pleas of Greene County by way of a Complaint that alleges claims against Range for breach of contract, unjust enrichment, and declaratory relief related to the Assignment. (Id.) Essentially, Jesmar contends that Range has breached the Assignment and is being unjustly enriched by only paying Jesmar for a portion of its ORRI from the natural gas produced from the Property, and improperly deducting costs from these payments. ((Id. at ¶ 31.)

On July 13, 2017, Range removed this action to federal court, predicating removal jurisdiction on diversity of citizenship. (Notice of Removal, ECF No. 1.) On July 18, 2017, Range filed the instant Motion to Dismiss or Stay Pending Arbitration. (ECF No. 4.) In response, Jesmar filed a Motion to Remand, which the Court denied on October 13, 2017. (ECF No. 19). Jesmar filed a Response in Opposition to the Motion to Dismiss or Stay Pending Arbitration on November 6, 2017 (ECF No. 22), and Range filed a Reply Brief on November 16, 2017. (ECF No. 24.) Thus, the motion is ripe for disposition.

## II. STANDARD AND APPLICABLE LAW FOR MOTION TO COMPEL ARBITRATION

The Court of Appeals for the Third Circuit has explained that "'when it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's

4

claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" Alder Run Land, LP v. Northeast Natural Energy LLC, 622 F. App'x 164, 166 (3d Cir. 2015) (quoting Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 772 (3d Cir. 2013)) (internal quotations and citations omitted); see also DCK N. Am., LLC v. Burns & Roe Servs. Corp., 218 F. Supp. 3d 465, 469-71 (W.D. Pa. 2016). If, however, "the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded with additional facts sufficient to place the agreement to arbitrate in issue," then "the Rule 12(b)(6) standard is no longer appropriate, and the issue should be judged under the Rule 56 standard," after discovery on the issue. Guidotti, 716 F.3d at 775-76; see also DCK N. Am., LLC, 218 F. Supp. 3d at 469-70.

If, as Range contends, Rule 12(b)(6) applies, the complaint "must allege facts sufficient to show that the plaintiff has a plausible claim for relief." DCK N. Am., LLC, 218 F. Supp. 3d at 471. The Court must accept all "well-pleaded facts" as true and disregard all legal conclusions. Id.[2]

The Federal Arbitration Act ("FAA") "establishes a strong federal policy in favor of the resolution of disputes through arbitration." Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 263 (3d Cir. 2003) (citation omitted). Under the FAA, a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition

---

[2] In its Response in Opposition, Jesmar agrees that "Range accurately sets forth the legal standard governing Rule 12(b)(6) motions . . . as it relates to the requisite grounds for a motion to compel. (ECF No. 22, at 5.) Jesmar contends, however, that "the standard and Range's arguments in furtherance of that standard are inapplicable because there is simply no obligation of the parties to arbitrate this dispute." Id.

any United States District Court . . . for an Order directing that such arbitration proceed in the manner provided in the agreement." Grimm v. First Nat'l Bank of Pa., 578 F. Supp. 2d 785, 791 (W.D. Pa. 2008) (citing 9 U.S.C. § 4). If the Court "is satisfied that the issue before it is referable to arbitration, upon application of one of the parties," the Court "shall stay its proceedings until the arbitration has been had in accordance with the terms of the agreement." Id. at 791-92 (citing 9 U.S.C. § 3). If all of the claims set forth in the Complaint are arbitrable, the Court may dismiss the action instead of staying the case. Id. at 792.

Under the FAA, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." DCK N. Am., LLC, 218 F. Supp. 3d at 471 (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)). Thus, before compelling arbitration under the FAA, courts must resolve two threshold issues: (1) whether the parties entered into a valid agreement to arbitrate; and (2) whether the particular dispute falls within the scope of that agreement. Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009).[3]

In determining whether the parties have agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts" generally. Century Indem. Co. v. Certain

---

[3] Jesmar contends that Pennsylvania law, and not the FAA, applies in this case because the dispute at issue is based on the overriding royalty obligation under the Assignment, which does not involve interstate commerce. Jesmar Br. Opp. (ECF No. 22) at 6, n.2; see also Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005) (noting that the FAA governs transactions involving interstate commerce); 9 U.S.C. §§ 1, 2. Range believes the FAA controls because both the Assignment and the Lease concern the production and marketing of oil, gas, and coalbed methane for sale in interstate commerce. Range Br. Supp. (ECF No. 5) at 4 & nn. 2-3. The Court does not need to resolve this issue, however, because both parties agree that the applicable analysis is the same under both the FAA and Pennsylvania law. See id. at 4, n.3 (citing cases); Jesmar Br. Opp. (ECF No. 22) at 6, n.1; see also, e.g., Quiles v. Fin. Exch. Co., 879 A.2d 281, 283 n.3 (Pa. Super. Ct. 2005) ("In order to determine whether a claim is subject to arbitration, judicial inquiry is limited to the questions of whether a valid agreement to arbitrate was entered into and whether the dispute involved falls within the scope of the arbitration provision.").

Underwriters at Lloyd's London, 584 F.3d 513, 524 (3d Cir. 2009) (citations omitted). Once a court has found that there is a valid agreement to arbitrate, the determination of whether the particular dispute falls within the scope of that agreement is a matter of federal law. Id. In deciding whether a dispute falls within the scope of the arbitration agreement, a presumption of arbitrability applies. Id. That is, "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Id. (quoting AT&T Techs., Inc. v. Comm'ns Workers, 475 U.S. 643, 650 (1986)); see also Kirleis, 560 F.3d at 160.

### III. ANALYSIS

The central question at issue here is whether Jesmar and Range agreed to arbitrate disputes arising under the Assignment, and, in particular, the dispute over the overriding royalty payments that is the focus of Jesmar's Complaint. Thus, the Court must determine whether a valid agreement to arbitrate between Jesmar and Range exists and, if so, whether the royalty dispute falls within the scope of that agreement.

In this regard, the Court notes that it is undisputed that the Assignment itself does not contain an arbitration clause. Rather, the arbitration language on which Range relies is the arbitration clause contained in the Lease entered into between the landowner and Jesmar. (ECF No. 5, at 5-7.) That language provides:

> ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this lease, performance thereunder, or damage caused by Lessee's operations, settlement shall be determined by a panel of three disinterested arbitrators. Lessor and Lessee shall appoint and pay the fee of one each, and the two so appointed shall appoint the third, whose fee shall be borne equally by Lessor and Lessee. The award shall be by unanimous decision of the arbitrators and shall be final.

(ECF No. 1-2, Ex. A.) Although Range agrees that the Assignment conveyed Jesmar's right, title, and interest in the Lease to Rice Energy (who subsequently assigned the same to Range), it contends that that Lease's arbitration provision was incorporated by reference into the Assignment, thus binding both the Assignor and Assignee to arbitrate disputes arising thereunder. (ECF No. 5, at 6-7.) Jesmar disagrees and argues that the absence of arbitration language in the Assignment shows that the parties did not agree to arbitrate disputes under the Assignment. Jesmar dismisses Range's "incorporation-by-reference" argument, claiming that it "wholly ignores the context of the Assignment and the role of the overriding royalty reservation in the transaction." (ECF No. 22, at 6-8.)

After careful review of the Complaint and the documents attached thereto, the Court cannot find that the parties agreed to arbitrate disputes arising under the Assignment. Under Pennsylvania law, "[a]n assignment is a transfer of property or a right from one person to another; unless qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." Crawford Central Sch. Dist. v. Comm'w of Pa., 888 A.2d 616, 619 (Pa. 2005). "Under the law of assignment, the assignee succeeds to no greater rights than those possessed by the assignor." Id. at 619-20 (citations omitted). Likewise, "[a]n assignee's rights . . . are not inferior to those of the assignor." Id. at 620. In other words, "an assignee stands in the shoes of the assignor." Id.

Applying these principles, the Court has no doubt that the arbitration provision in the Lease binds Range, as the Assignee, to arbitrate disputes between itself and the Lessor, Mr. Main. As set forth above, it is well-established that the Assignee steps into the Lessee's shoes. It also is

8

clear that, following the Assignment, Jesmar no longer was a party to the Lease, and, thus, unless otherwise specified, the rights and obligations contained in the Lease, including the arbitration clause, no longer applied to Jesmar going forward. The relevant question here, therefore, is whether, as Range argues, the Assignment incorporated the Lease's arbitration provision by reference so that Jesmar, as Assignor, and Range, as Assignee, must arbitrate any disputes arising under the Assignment.

Under Pennsylvania law, "incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." Chesapeake Appalachia, LLC v. Scout Petroleum, LLC, 809 F.3d 746, 760-61 (3d Cir. 2016); see also Century Indem. Co., 584 F.3d at 534 (discussing incorporation by reference in the arbitration context). In support of its argument that the Assignment effectively incorporates the Lease's arbitration provision by reference, Range points to the Assignment's *habendum* clause, which reads as follows:

> TO HAVE AND TO HOLD the same unto the ASSIGNEE, its successors and assigns, according to the terms, covenants, and conditions of the Subject Lease, the ASSIGNEE to perform all such terms, covenants, and conditions thereof as to the Subject Lands, as well as all of the terms, covenants, and conditions hereof.
>
> The reservations, terms, conditions, and conditions hereof shall be binding upon and shall inure to the benefit of ASSIGNORS and ASSIGNEE, their respective successors and assigns, and shall attach to and run with the Subject Lease and the Subject Lands and with each transfer or assignment thereof.

(ECF No. 1-2, Ex. B.) Specifically, Range contends that through the language, "according to the terms, covenants, and conditions of the Subject Lease," in the first paragraph of this clause, Jesmar

9

expressly agreed that the Assignment would be subject to the same "terms, covenants, and conditions" that exist under the Lease, including the Lease's arbitration provision. (ECF No. 5, at 6-7.)

After careful consideration, the Court disagrees that the presence of this language in the Assignment establishes the arbitrability of the instant dispute. Rather, as Jesmar argues, the more appropriate purpose of this provision in context is to identify the transfer of Jesmar's rights, duties, and obligations under the Lease to the Assignee. The location of this language in the *habendum* clause supports this interpretation. By definition, a *habendum* clause is "the part of an instrument . . . that defines the extent of the interest being granted and any conditions affecting the grant. . . . The introductory words to the clause are ordinarily *to have and to hold*." Black's Law Dictionary (10th ed. 2014) (emphasis in original). Also of note, although this paragraph refers to the duty to perform all of the "terms, covenants, and conditions" of both the Assignment *and* the Lease, it does so solely with respect to the "Assignee." See ECF No. 1-2, Ex. B ("**TO HAVE AND TO HOLD** the same unto the ASSIGNEE, its successors and assigns, according to the terms, covenants, and conditions of the Subject Lease, the ASSIGNEE to perform all such terms, covenants, and conditions *thereof* as to the Subject Lands, as well as all of the terms, covenants, and conditions *hereof*.") (emphasis added). In contrast, the second paragraph of the clause, which applies to *both* the Assignor and Assignee, refers to the binding nature of the Assignment only. See id. ("The reservations, terms, covenants, and conditions *hereof* shall be binding upon and shall inure to the benefit of ASSIGNORS *and* ASSIGNEE . . . ." (emphasis added)).

The Court has examined the remaining provisions of the Assignment and has not found any other language conveying an intent to incorporate the Lease by reference so as to bind *both*

parties to its terms. The closest such language occurs in the introductory paragraph where it states that a copy of the Lease is "attached hereto and made a part hereof for all purposes, for all depths." (ECF No. 1-2, Ex. B). Again, however, in the context of the Assignment, this reference to the Lease more properly serves to identify the rights, title, and interest, conveyed by Jesmar, than to incorporate its terms.[4] Indeed, it makes little sense that an assignor would intentionally incorporate by reference into an assignment agreement the terms of the contract that it was, by the very same agreement, assigning away. The lack of explicit incorporation language in the Assignment and the presence of limiting language in the arbitration clause itself further support the conclusion that the Assignment does not incorporate the arbitration provision set forth in the Lease.

In its Reply Brief, Range cites the 38-page decision of the Court of Appeals for the Third Circuit in Century Indemnity as authority supporting arbitrability in this case. In Century Indemnity, the Court of Appeals found that certain retrocessional agreements between a retrocedent and retrocessionaire incorporated the arbitration clauses contained in reinsurance treaties between the retrocedent and its reinsured, forming an agreement between the retrocedent and retrocessionaire to arbitrate disputes, even though the retrocessionaire was not a signatory to the reinsurance treaties containing the arbitration clause.[5] Century Indem., 584 F.3d at 555-57.

---

[4] In its Opposition Brief, Jesmar also refers to the "Prior Agreement" clause set forth at paragraph 2 of the Assignment as a possible source of Range's argument. (ECF No. 22, at 7.) This clause states that the "Assignment is expressly made in conformance with and subject to the terms, covenants, and conditions of that certain Agreement, dated August 20, 2011, and fully executed on August 31, 2011 between ASSIGNOR and ASSIGNEE herein." (ECF No. 1-2, Ex. B.) Although Jesmar claims that Range "places great emphasis" on the Prior Agreement paragraph, the Court could not find any reference to it in Range's Briefs. In any event, the dates in the Prior Agreement clause do not match the date of the Lease (April 11, 2007) and, therefore, the clause does not appear to be relevant to the instant dispute.

[5] Reinsurance contracts covering classes of risk rather than particular policies are called reinsurance treaties. Retrocessional agreements are contracts for reinsurance of reinsurance. A retrocessionaire is a reinsurer of reinsurance. GCIS Ins. Servs., Inc. v. Lincoln Gen. Ins. Co., 773 F. Supp. 2d 490, 501 n.1.

In so holding, the Court noted, inter alia, that the retrocessional agreements contained two paragraphs containing incorporation language, the second of which expressly stated that all terms and provisions of the policy "shall be applied to this agreement as if contained herein."  Id. at 550-51, 555.  Range also points to the Court's statement that an arbitration clause incorporated by reference into a subsequent agreement may still apply to the parties to the subsequent agreement even where, as here, the arbitration clause contains narrow language restricting arbitration to disputes between the specific parties to the original agreement.  Id. at 555-57.

After careful review, the Court finds that Century Indemnity is not dispositive here. Although the Court of Appeals found that the district court properly compelled arbitration in that case, it reached that decision only after discussing and/or distinguishing numerous previous cases, including many that did not find an agreement to arbitrate, either through incorporation by reference or otherwise.  See id. at 525-56 and cases cited therein.  It is clear from the Court's painstaking analysis that it was not proclaiming a bright-line rule; but, rather, recognizing that arbitrability depends on the circumstances of each individual case, including, inter alia, the type of agreement at issue, the purpose of the agreement, the language employed, and the intent of the parties.  Id.  The types of agreements at issue here do not resemble the retrocessional agreements at play in Century Indemnity, and Range has not cited any authority applying the Court's reasoning in Century Indemnity to arbitration provisions in the context of a lease assignment such as the one in this case.  If anything, the Century Indemnity Court distinguished cases more closely analogous to the instant case in which courts did not find an incorporated agreement to arbitrate where the purpose of the incorporation clause was to define the scope of a party's rights and/or obligations, and not to incorporate the entirety of the original contract into the second agreement.  See id. at

12

548-49 and cases cited therein; see also id. at 549 (noting that even with broadly worded arbitration clauses, "courts may refuse to compel arbitration where the parties to not intend to incorporate the agreement to arbitrate").

In short, the Court agrees with Jesmar that, although applicable law recognizes the incorporation of arbitration provisions into other agreements, that law does not mandate arbitration of the dispute at issue in this case. As set forth above, nothing in the Complaint or the agreements attached thereto indicate that the parties to the Assignment intended to incorporate the Lease's arbitration clause into the Assignment or otherwise agreed to arbitrate disputes under the Assignment. Because Jesmar and Range did not agree to arbitrate disputes under the Assignment, Range's Motion will be denied.[6]

## IV. CONCLUSION

For the reasons set forth above, the Court will deny Range's Motion to Dismiss or Stay Pending Arbitration (ECF No. 4). An appropriate order will follow.

Dated: March 26, 2018

---

[6] Jesmar further argues that, even if the parties agreed to arbitrate, that the instant dispute is not within the scope of Lease's arbitration provision. (ECF No. 22, at 9-12). The crux of Jesmar's argument is that the arbitration provision is limited to disagreements "between the *Lessor* and *Lessee*" concerning the "lease, performance thereunder, or damage caused by Lessee's operations." Id. (citing ECF No. 1-2, Ex. A.) (emphasis added). Because the dispute here is between Jesmar and Range, and not the "Lessor and Lessee," and because it concerns performance under the Assignment and not the Lease, Jesmar reasons that the dispute falls outside of this narrow scope. Id. Although Jesmar's argument appears logical and consistent with the contractual language at issue, the Court of Appeals in Century Indemnity was careful to note that, given the presumption of arbitrability when addressing scope, even narrow language such as this can sometimes be read to apply more broadly. Century Indemnity, 584 F.3d at 555-57. In this case, the Court agrees with Jesmar that the limiting language of the arbitration agreement is consistent with the conclusion that the parties to the Assignment did not agree to arbitrate disputes arising under the Assignment. Because the Court does not find a valid agreement to arbitrate, however, further analysis of the scope issue is unnecessary.

BY THE COURT:

_____
LISA PUPO LENIHAN
United States Magistrate Judge

cc: All Counsel of Record
*Via Electronic Mail*